# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MMPC SUB, INC., f/k/a PROGENY, INC., ) ) ) Plaintiff, ) ) v. ) ) MIDMARK CORPORATION, ) ) Defendant. ) | Case No. 13 C 3950<br><br>Judge Joan B. Gottschall |

## MEMORANDUM OPINION & ORDER

Plaintiff MMPC Sub, Inc. ("MMPC"), formerly known as Progeny, Inc. ("Progeny"), has brought a three-count amended complaint against Midmark Corporation ("Midmark"), seeking a declaratory judgment that Midmark is barred from imposing certain accounting adjustments to Progeny's 2012 "Adjusted EBITDA."[1] The accounting adjustments that Midmark seeks to impose would result in a substantially lower 2012 earn-out payment to MMPC under the parties' 2009 Asset Purchase Agreement (the "APA"). Midmark has moved to stay this action pending arbitration. Because the court finds that the issues raised in MMPC's complaint are subject to arbitration under the APA, the court grants the motion to stay.

## I. FACTS

The material facts are undisputed. Midmark manufactures and sells equipment for the medical, dental, and veterinary industries. Progeny, Inc. ("Progeny") manufactured and sold imaging equipment for those same industries. In 2009, Midmark purchased substantially all of the assets of Progeny pursuant to an asset purchase agreement. Under the APA, Midmark was to pay Progeny yearly earn-outs over the course of four years if certain performance objectives

---

[1] "EBITDA" stands for earnings before interest, taxes, depreciation, and amortization.

were met.  If, for a given year, Progeny's "Adjusted EBITDA" exceeded the "Threshold EBITDA," then Midmark would pay Progeny an earn-out of 6.6283395 times that difference.  If the Adjusted EBITDA was less than the Threshold EBITDA, then Midmark would not pay the earn-out.

The APA set forth a process for determining the Adjusted EBITDA.  First, Midmark would calculate the Adjusted EBITDA "in accordance with (i) generally accepted accounting principles . . . ("GAAP"), consistently applied . . . ."  (APA §§ 2.7 & 2.9.)  Midmark would then deliver "to [Progeny] a certified statement setting forth in reasonable detail [Midmark's] calculation of the Adjusted EBITDA for the prior fiscal year and its calculation of the [earn-out] for such fiscal year."  (*Id.* § 2.7.)  Progeny then had thirty days to "give[] written notice to [Midmark] disputing such statement providing reasonably detail regarding the basis of such dispute . . . ."  (*Id.*)  If Progeny gave Midmark a dispute notice, then the parties were to use their best efforts to settle the dispute within thirty days.  If "[a]ny such dispute" remained unresolved after the thirty-day period, then that dispute was to be submitted to an accounting firm, "who [would] act as an arbitrator and resolve the dispute in a manner consistent with the procedures set forth in Section 2.4.4."  (*Id.*)  Section 2.4.4, in turn, provided that "the matters objected to [by Progeny] (and only such matters)" would be submitted to the accounting firm, which would "act as an arbitrator and . . . resolve the dispute and submit a written statement of such resolution within thirty (30) days, which statement [would] be binding on all parties . . . ."  (*Id.* § 2.4.4.)

In 2012, the last year that an earn-out was to be paid, a dispute arose concerning Midmark's calculation of Adjusted EBITDA for that year.  Midmark calculated the 2012 Adjusted EBITDA to be $5,589,536, which was $822,605 over 2012 Threshold EBITDA.  Applying the 6.6283395 multiple to that difference, Midmark was to pay Progeny an earn-out of

$5,452,505 according to Midmark's calculations. By Progeny's calculations, however, the 2012 Adjusted EBITDA should have been $6,510,829, resulting in an earn-out of $11,355,408—a difference of $5,902,903.

On April 30, 2013, counsel for Progeny's successor, MMPC, sent Midmark a letter disputing Midmark's calculation of Progeny's 2012 Adjusted EBITDA. In the letter, MMPC's counsel stated:

> Midmark's positions are inconsistent with (i) the [APA's] terms; (ii) the parties' course of dealing in this and prior years, including but not limited to the [earn-out] calculated for the Progeny Division's Adjusted EBITDA in 2009, 2010, and 2011, some 45 monthly financial reports provided by Midmark employees in its Progeny Division to and accepted by Midmark senior management, and the annual financial budgets prepared by those same Progeny Division employees and blessed by Midmark's senior management and Board of Directors; (iii) Midmark's (and seemingly its auditor's) own past practices for 2009, 2010, and 2011; and (iv) Midmark's EBIT calculation earlier this year, which resulted in the payment of performance bonuses to [MMPC's former president and CEO] Ed McDonough and to Midmark's other Progeny Division employees.

(Pl.'s Reply Ex. 1 ("Dispute Notice") 3, ECF No. 21-1 (footnotes omitted).)

Unable to resolve this dispute, MMPC filed an amended complaint in this court on June 17, 2013. The complaint alleges that "Midmark has improperly made adjustments to the Progeny Division's 2012 EBITDA." (Am. Compl. ¶ 5, ECF No. 7.) MMPC further alleges that, even assuming that Midmark's adjustments are proper, Midmark is barred from seeking to impose the adjustments to Progeny's Adjusted EBITDA under the doctrines of waiver and estoppel. MMPC alleges:

> The adjustments that Midmark now asserts . . . are inconsistent with Midmark's previous treatment of Progeny/MMPC's pre-transaction audited financial statements, how Midmark determined Adjusted EBITDA and the Contingent Purchase Price in 2009[,] 2010[,] and 2011, with the Midmark/Progeny Division's budget processes since Midmark's purchase of Progeny/MMPC and with its receipt and review of monthly financial and operation reports, "location review" reports, routine forecast updates, Deloitte & Touche's unquestioned audits of the 2009, 2010 and 2011 earn-out calculation, and its payments of bonuses to Mr. McDonough and key Progeny employees.

3

(Am. Compl. ¶ 101.)

MMPC seeks a judicial declaration that: (i) "Midmark and Progeny/MMPC did not agree to submit to the Independent Accountants the legal questions of whether or not Midmark is estopped from claiming adjustments inconsistent with prior conduct upon which MMPC relied and whether or not Midmark waived its right to claim these adjustments"; (ii) "as a matter of law, Midmark is estopped from making adjustments . . . that are inconsistent with Midmark's previous [accounting practices]"; and (iii) "as a matter of law, Midmark waived any right to make [the challenged] adjustments . . . ." (Am. Compl. ¶¶ 98, 106, 116.)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 *et seq.*, reflects "both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, ––– U.S. –––, 131 S. Ct. 1740, 1745 (2011) (citations and internal quotation marks omitted). To advance this policy, the FAA provides for stays of litigation in federal courts when an issue in the case is "referable to arbitration." *See* 9 U.S.C. § 3. Where a contract includes an arbitration clause, the clause creates a presumption that the dispute should be arbitrated, unless the party opposing arbitration can show that the clause is incapable of an interpretation that could cover the dispute. *See Wilson v. Palisades Collection, LLC*, No. 12 C 5460, 2012 WL 6692152, at *1 (N.D. Ill. Dec. 19, 2012). "'Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .'" *Stone v. Doerge*, 245 F. Supp. 2d 878, 881 (N.D. Ill. 2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)), *aff'd*, 328 F.3d 343 (7th Cir. 2003).

**III. ANALYSIS**

The parties agree that Section 2.7 of the APA contains an arbitration clause, so the FAA applies to Midmark's request for a stay. The parties dispute whether the issues raised in the complaint fall within the arbitration clause.

The court begins with the text of the arbitration clause. That clause provides that if Progeny disputes Midmark's statement setting forth Midmark's calculation of Adjusted EBITDA, then "any such dispute . . . shall be submitted to the Independent Accountants, who shall act as an arbitrator . . . ." (APA § 2.7.) Thus, any dispute over Midmark's statement setting forth its calculation of Adjusted EBITDA was to be submitted to arbitration.

Here, there can be little disagreement that the substance of the issues raised in MMPC's complaint is the same as the substance of the issues raised in MMPC's dispute notice. Both the waiver/estoppel issues and the accounting issues essentially concern whether Midmark calculated 2012 Adjusted EBITDA consistent with its historical accounting practices. The dispute notice charges that "Midmark's positions are inconsistent with (i) the Agreement's terms; (ii) the parties' course of dealing . . . ; (iii) Midmark's . . . own practices for 2009, 2010, and 2011; and (iv) Midmark's EBIT calculation earlier this year . . . ." (Dispute Notice 3.) The amended complaint alleges that "[t]he adjustments . . . are inconsistent with Midmark's previous treatment of Progeny/MMPC's pre-transaction audited financial statements, how Midmark determined Adjusted EBITDA and the Contingent Purchase Price in 2009[,] 2010[,] and 2011, . . . and with its receipt and review of monthly financial and operation reports . . . ." (Am. Compl. ¶ 10.) Thus, whether Midmark is barred from making certain adjustments by the doctrines of waiver and estoppel is just as much a "dispute" over Midmark's calculation of

Adjusted EBITDA as any issue raised in the dispute notice. Under the plain language of Section 2.7, it would seem that such a dispute must go to arbitration.

MMPC argues, however, that the issues raised in its complaint cannot be submitted to arbitration because its waiver and estoppel claims involve questions of law. As an initial matter, nothing in the APA excepts questions of law from the issues that are subject to arbitration. More importantly, however, MMPC's "legal claims" are, in every relevant respect, challenges to Midmark's accounting methodology. To determine whether Midmark is estopped from making the challenged adjustments to EBITDA, for example, the court must look to whether Midmark's calculation of 2012 Adjusted EBITDA was consistent with its past conduct. This is the same analysis that the arbitrator would perform in determining whether Midmark's 2012 Adjusted EBITDA was prepared in accordance with "generally accepted accounting principles . . . ("GAAP"), consistently applied . . . ." (APA § 2.9). Thus, if the court grants Midmark's request for a stay, the accountants would not be forced to resolve an issue that is any more "legal" in nature than the accounting issues that they would normally resolve.

The authority that MMPC cites is not to the contrary. In *BBCM, Inc. v. Health Sys. Int'l, LLC*, No. 10 C 0086, 2010 WL 4607917 (N.D. Iowa Nov. 4, 2010), the seller brought claims for breach of contract and breach of the covenant of good faith and fair dealing against the buyer, alleging that the buyer took certain actions—imposing new requirements resulting in lost revenue, entering into financially disadvantageous contracts, and diverting business revenues to other companies—that contravened express covenants contained in the parties' asset purchase agreement. *Id.* at *4. The court found that such "operational matters" were outside the scope of the parties' accounting arbitration clause. *Id.* at *8. The court noted that the asset purchase

agreement "specifically preserves [the seller's] judicial remedies for a breach of" covenant. *Id.* at *6.

Here, by contrast, the amended complaint does not assert claims for breach of contract or breach of the covenant of good faith and fair dealing. MMPC is not asking the court to determine whether Midmark's operations constituted breaches of covenants under the APA, for which MMPC may be entitled to damages beyond simply the loss of a higher earn-out payment. Rather, MMPC seeks a judicial declaration that Midmark is barred from making certain accounting adjustments in light of its historical accounting practices. But that is precisely the issue that the parties agreed the accounting arbitrator would decide.

The other cases cited by MMPC are similarly inapposite. *See Harker's Distribution, Inc. v. Reinhart Foodservice, L.L.C.*, 597 F. Supp. 2d 926, 940 (N.D. Iowa 2009) (finding that issue of whether there had been a unilateral mistake should not be submitted to accountant); *Blutt v. Integrated Health Servs., Inc.*, No. 96 C 3612, 1996 WL 389292, at *3 (S.D.N.Y. July 11, 1996) (finding that the plaintiffs' breach of duty of good faith and fair dealing claim was not subject to accounting arbitration clause); *Powderly v. MetraByte Corp.*, 866 F. Supp. 39, 42-43 (D. Mass. 1994) (finding that the plaintiff's breach of covenant of good faith and fair dealing claim was not subject to accounting arbitration). Each of these cases involved legal issues that were separate from the accounting dispute. Here, the allegations in MMPC's complaint overlap entirely with the issues raised in its dispute notice.

MMPC also makes textual arguments, but they are unavailing. MMPC argues that because the arbitration clause refers to "any such dispute" instead of "any and all disputes relating to [the earn-out]," the arbitration clause should be interpreted narrowly. To be sure, the arbitration clause is not broad, but the court does not rely on the clause's breadth to reach its

7

conclusion that the issues raised in Midmark's complaint fall within the arbitration clause. The plain language of the clause squarely encompasses such issues. MMPC also argues that "[t]he governing provisions plainly contemplate that certain matters will not be submitted to an accountant arbitrator." (Pl.'s Opp. 11.) That is also true, but it sheds no light on whether the matters at hand should be submitted to an accountant arbitrator.

Looking to the APA as a whole further confirms that the issues raised in MMPC's complaint are subject to arbitration. The process set forth in Sections 2.4.4 and 2.7 for resolving disputes over the earn-out payments evinces the parties' desire for an expeditious resolution of any such disputes. That process allowed for (i) thirty days for MMPC to submit a dispute notice after receiving Midmark's calculation; (ii) thirty days for the parties to resolve their dispute informally; and (iii) if the parties could not do so, thirty days for the arbitrator to decide the dispute. Once the arbitrator made its decision, it was to be "binding on all parties." (APA § 2.4.4.) The APA thus contemplated a process that would get the parties from the dispute notice to a binding resolution within ninety days. An interpretation of the APA that would permit MMPC to engage in protracted litigation in federal court would be inconsistent with such a process.

Finally, pragmatic considerations strongly favor staying this action. Post-closing purchase price adjustment disputes, wherein a party opposing arbitration challenges whether another party's adjustments are consistent with historical accounting practices, are ubiquitous. There is nothing exceptional about MMPC's consistency argument. If the court were to allow MMPC to litigate its challenge to Midmark's adjustments in this case, then *any* party opposing arbitration of a purchase price adjustment dispute would be able to do so, and agreeing to arbitrate would lose much of its appeal.

## IV. CONCLUSION

For the foregoing reasons, Midmark's motion to stay this action pending arbitration is granted.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 13, 2014